**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-1427
_____

UNITED STATES OF AMERICA

v.

WILLIE ELMORE,
                              Appellant
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1-11-cr-00361-002)
District Judge: Honorable Christopher C. Conner
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
September 27, 2013

Before:   CHAGARES, VANASKIE, and SHWARTZ, *Circuit Judges.*

(Filed: December 18, 2013)
_____

OPINION
_____

VANASKIE, *Circuit Judge.*

Appellant Willie Elmore appeals his conviction and sentence on charges arising

out of an armed bank robbery.  Elmore raises several issues: (1) whether Fed. R. Crim. P.

16(a)(1)(A) required pretrial disclosure of Elmore's non-verbal actions during an

interrogation by a law enforcement agent; (2) whether the District Court erred in denying

his motions to suppress evidence; (3) whether the District Court incorrectly assigned him criminal history points for a prior conviction; and (4) whether the District Court incorrectly assigned him an enhancement for obstruction of justice. Concluding that the District Court did not err in any of the ways argued by Elmore, we will affirm.

I.

We write primarily for the parties to this action, who are familiar with the facts and procedural history of this case. Accordingly, we set forth only those facts necessary to our analysis.

On September 16, 2011, two masked men robbed the Fulton Bank located in Etters, PA. The men took $13,761 in cash, including ten $20 bills for which the bank had recorded the serial numbers.[1]

Upon entering the bank parking lot at the time of the robbery, eyewitness Susan Stabley observed a black Chevrolet Blazer that was parked "at a very strange place," outside of any parking space. (App. 84). Stabley saw a masked man exit the vehicle and enter the bank, at which point she suspected a robbery was in progress. Stabley left the bank parking lot and drove to a nearby Rutter's Farm Store parking lot, intending to write down the partial Pennsylvania license plate number she had seen displayed on the vehicle. Stabley then observed a black Chevrolet Blazer drive by her into the Rutter's parking lot. Although it now displayed a North Carolina license plate with a different number, Stabley was certain this was the same Blazer she had seen at the bank, as it was

---

[1] Such currency is known as "bait money," as law enforcement is able to match the stolen bills to a log of serial numbers maintained by the bank.

an old vehicle of a make that she had rarely seen in the area. Stabley recorded this plate number before returning to the bank to report the information to the police officers, who had already arrived on the scene.

The officers put out a county-wide bulletin for a vehicle matching the description Stabley had provided. Police stopped Elmore an hour and a half later after observing him driving a black Chevrolet Blazer sporting the North Carolina license plates within 15 miles of the bank. Elmore was immediately arrested and patted down. Officers recovered $510 in Elmore's pocket, including six bills that matched the "bait money" that had been taken during the robbery. Officers also observed cash laying in plain view on the passenger seat of Elmore's vehicle.

Based on the above information, the officers sought and obtained a search warrant for the Blazer, which was executed later that day. Inside the car, officers found $1,510 and a Motorola Droid cellular phone. Officers sought and obtained a search warrant for the phone found in the vehicle, which was executed on September 22, 2011. Officers also obtained warrants to search the records of both the Droid phone found in the car as well as another number that the Droid had dialed and received calls from around the time of the robbery. These warrants were executed on September 22, 2011 and September 28, 2011, respectively.

Tristan Green was arrested independently of Elmore in connection with the robbery. On December 20, 2011, Elmore and Green were indicted on charges of armed bank robbery in violation of 18 U.S.C. §§ 2113(a), (d), and 2, and use of a firearm in

furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A). They were tried together.

Prior to trial, the District Court denied Elmore's motion to suppress the evidence found in his vehicle. During the trial, the court admitted testimony by FBI Agent Christopher Nawrocki about his interrogation of Elmore on the day of the robbery. Nawrocki testified that Elmore repeatedly denied involvement in the robbery, stating "I didn't rob no bank" in response to questions about the bait money that had been found in his possession. (App. 149). Nawrocki noted, however, that Elmore "looked away" when shown a photograph of Green and "snapped" his head towards Nawrocki "very quickly" after Nawrocki mentioned Green's name. (App. 149, 162).

After a four-day jury trial, Elmore and Green were each found guilty of both counts. On February 14, 2013, Elmore was sentenced to 168 months' imprisonment.

## II.

The District Court had jurisdiction under 18 U.S.C. § 3231, and we have appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## A. Admission of Agent Nawrocki's Testimony on Elmore's Non-Verbal Reactions

Elmore first contests the District Court's admission of Agent Nawrocki's testimony about Elmore's non-verbal actions during an interrogation, arguing that those actions constituted "statement[s]" the prosecution was required to disclose to him prior to trial pursuant to Fed. R. Crim. P. 16(a)(1)(A). That rule mandates that "[u]pon a defendant's request, the government must disclose to the defendant the substance of any relevant *oral* statement made by the defendant, before or after arrest, in response to

4

interrogation by a person the defendant knew was a government agent if the government intends to use the statement at trial." Fed. R. Crim. P. 16(a)(1)(emphasis added)

Although by its own language Rule 16(a)(1)(A) only applies to "oral statement[s]," Elmore argues that in other contexts—such as hearsay law—non-verbal conduct is sometimes recognized as a "statement." Even accepting *arguendo* Elmore's contention that the term "oral statement" in Fed. R. Crim. P. 16(a)(1)(A) should be interpreted analogously to the term "statement" in the Federal Rules of Evidence, the conduct at issue here plainly does not qualify. Rule 801(a) of the Federal Rules of Evidence defines a "statement" as "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." We agree with the District Court that Elmore's movements, as described by Agent Nawrocki at trial, were "involuntary reaction[s] to a question, certainly not intended as an assertion." (App. 160). Because his reaction was not intended as a communicative assertion, Rule 16(a)(1)(A) is not implicated.

Even if the Rule was applicable, any error in admitting Agent Nawrocki's does not warrant setting aside the jury verdict. We have held that violations of Rule 16 of the Federal Rules of Criminal Procedure warrant a new trial only where the "'District Court's actions resulted in prejudice to the defendant.'" *United States v. Davis*, 397 F.3d 173, 178 (3d Cir. 2005) (quoting *United States v. Lopez*, 271 F.3d 472, 483 (3d Cir. 2001)). The evidence of guilt was so abundant that Elmore cannot show "a likelihood that the verdict would have been different" had the government disclosed prior to trial his

5

reaction to the two statements made by Agent Nawrocki.  *See id*. (quoting *Lopez*, 271

F.3d 472, 484 (3d Cir. 2001)).

**B. Denial of Suppression Motions**

Elmore next argues that the District Court should have granted his motions to

suppress evidence found during the search of his vehicle and the subsequent searches of

records relating to several cell phones connected to him.  Elmore argues that the

information Stabley gave to police could not support a finding of probable cause to arrest

him and to search his vehicle, because the vehicle Stabley saw in the bank parking lot had

a different license plate.

Law enforcement officers may make an investigative stop of a vehicle upon

"reasonable suspicion" of wrongdoing.  *United States v. Hensley*, 469 U.S. 221, 226

(1985).  Following a valid traffic stop, "[p]olice have probable cause to arrest if the

circumstances are sufficient to cause a prudent person to believe that a crime has been

committed and the person to be arrested committed it."  *United States v. Stubbs*, 281 F.3d

109, 122 (3d Cir. 2002).  "We review a district court's determinations of reasonable

suspicion and probable cause de novo."  *United States v. Harple*, 202 F.3d 194, 196 (3d

Cir. 1999).  Probable cause and reasonable suspicion are both to be evaluated based upon

the "totality of the circumstances."  *United States v. Arvizu*, 534 U.S. 266, 275 (2002);

*Illinois v. Gates,* 462 U.S. 213, 230-31 (1983).  Officers are permitted to draw from "their

own experience and specialized training to make inferences from and deductions about

the cumulative information available."  *Arvizu*, 534 U.S. at 273.

The "totality of the circumstances" here gave the arresting officers both reasonable suspicion to make the investigative stop of the vehicle and probable cause to effectuate the warrantless arrest of Elmore. The stop of Elmore's vehicle was based on an exact match of the license plate number and vehicle description provided by a reliable eyewitness.

In assessing the reliability of an informant's tip, we look to factors including whether:

> "(1) the information was provided to the police in a face-to-face interaction, allowing an officer to assess directly the informant's credibility; (2) the informant can be held responsible if her allegations are untrue; (3) the information would not be available to the ordinary observer; (4) the informant has recently witnessed the criminal activity at issue; and (5) the witness's information accurately predicts future activity."

*United States v. Johnson*, 592 F.3d 442, 449 (3d Cir. 2010). Many of those factors were satisfied by Stabley's conversation with the officers at the bank. Stabley provided the officers with the vehicle's description in a face-to-face interaction shortly after she witnessed the robbery. Stabley gave officers her biographical and contact information, allowing them to hold her responsible if it was later revealed that she had provided false information. Finally, Stabley gave the officers a specific license plate number that was later located within 15 miles of the robbery site.

Although Stabley provided two different license plate numbers, an analysis of the "totality of the circumstances" still supports the conclusion that police officers had a "particularized and objective basis for suspecting legal wrongdoing" when they stopped

7

Elmore's vehicle. *Arvizu*, 534 U.S. at 273. Stabley saw the Blazer bearing the North Carolina license plates in the Rutter's parking lot just minutes after witnessing the robbery from the bank parking lot located just down the street. Stabley testified that she was certain at the time that this was the same Blazer she had seen masked men exit in the bank parking lot, based upon the age and the uniqueness of the vehicle. Officers were permitted to draw the inference that the operators of the vehicle involved in the bank robbery might have changed its license plate in an attempt to avoid detection. *See, e.g., United States v. Hartz,* 458 F.3d 1011, 1017 (9th Cir. 2006) (carjackers switched license plates with another vehicle "to increase their chance of avoiding capture"). Elmore was found within 15 miles of the bank an hour and a half after the robbery, operating a vehicle whose description and license plates were an exact match to those provided by a reliable eyewitness. Based on the totality of the circumstances, we conclude that officers also had probable cause to arrest him at this point.

Because probable cause existed to arrest Elmore, law enforcement officers would not have violated Elmore's Fourth Amendment rights had they immediately searched the vehicle after taking Elmore into custody. *See Arizona v. Gant*, 556 U.S. 332, 343 (2009). (holding that "circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle"). The officers instead awaited a Magistrate's issuance of a warrant before searching the vehicle. We see no basis to conclude that this search was invalid. The subsequent searches of phone data and phone records are therefore not fruits of an invalid search and were also properly admitted at trial.

8

## C. Calculation of Guideline Range

Elmore argues the District Court erred in sentencing him by accepting his Pre-Sentence Report, which assigned him three criminal history points for a 1992 conviction involving the possession of stolen property and provided for a two level enhancement for obstruction of justice.

The Report calculated Elmore's criminal history points under U.S.S.G. § 4A1.1(a), which advises courts to apply three points for "each prior sentence of imprisonment exceeding one year and one month." The application notes for § 4A1.1(a) provide that "[a] sentence imposed more than fifteen years prior to the defendant's commencement of the instant offense is not counted unless the defendant's incarceration extended into this fifteen-year period." Elmore was sentenced to a term of 2 to 4 years in prison in August of 1993 for possession of stolen property. Elmore's sentence on that charge expired on July 5, 1997, within fifteen years of the commission of the bank robbery on September 16, 2011.

Elmore argues that because his term of imprisonment for the possession of stolen property offense was indeterminate, with a minimum of two years, he only remained incarcerated into the § 4A1.1(a) period due to the imposition in September of 1994 of a 12 ½ to 15 year sentence for an unrelated robbery conviction. Elmore thus offers that his possession of stolen property offense should not count for three criminal history points under U.S.S.G. § 4A1.1(a). We disagree. Elmore's 1994 robbery sentence ran concurrently with his 1993 possession of stolen property sentence. Because Elmore was sentenced to greater than one year and one month of imprisonment on the possession of

9

stolen property charge and his incarceration on that sentence extended into this fifteen-year period prior to September 2011, the District Court did not err in applying three criminal history points for this conviction under § 4A1.1(a).

Elmore was also assigned a two-level enhancement for obstruction of justice based upon the testimony of his fellow inmate Philip Frasier. Frasier testified that Elmore had asked him for help in finding someone to kill Stabley. Elmore alleges that Frasier's testimony was not plausible. Regardless, "[t]he credibility of witnesses is quintessentially the province of the trial court, not the appellate court." *Dardovitch v. Haltzman*, 190 F.3d 125, 140 (3d Cir. 1999). We cannot conclude on appeal that the District Court erred in relying on Frasier's testimony.

III.

For the foregoing reasons, we will affirm the District Court's judgment.